UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIELD POINT III, LTD. and SPF CDO I, LTD., ) <br><br> Plaintiffs, ) <br><br> vs. ) <br><br> KRATOS DEFENSE & SECURITY SOLUTIONS, INC. and KEYBANK NATIONAL ASSOCIATION , ) <br><br> Defendants. | 09 Civ. 6921 (VM) "ECF" CASE <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiffs Field Point III Ltd. ("Field Point") and SPF CDO I, Ltd. ("SPF") (collectively, "Silver Point"), by and through their undersigned counsel, bring this action against Kratos Defense & Security Solutions, Inc. ("Kratos") and allege as follows:

## INTRODUCTION

1.      Silver Point loaned Kratos $50 million subject to certain carefully negotiated financial covenants.  Four of those financial covenants require Kratos to maintain certain minimum EBITDA, certain minimum leverage, certain minimum first lien leverage, and certain minimum liquidity.

2.      In an attempt to avoid default, Kratos has: (a) improperly recharacterized certain insurance proceeds as EBITDA; and (b) separately claimed that the Minimum Liquidity Ratio ("MLR") covenant is a mutual mistake and is invalid as written.  Silver Point disagrees with Kratos's claims and has brought this declaratory judgment action to resolve the disputed issues and to clarify the parties' associated rights.

3.      This Complaint requests that the Court:  (i) declare that Kratos has improperly mischaracterized insurance proceeds under the terms of the parties' credit agreement and related loan documents; and (ii) separately declare that the MLR covenant is enforceable as written.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1)-(2) because this is an action between citizens of different States and an action between citizens of a State and citizens of or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Kratos and KeyBank because Kratos and KeyBank transact business in this District and because Kratos and KeyBank expressly consented to personal jurisdiction in this District pursuant to Section 10.24(b) of the parties' Credit Agreement. *See* First Lien Credit Facility, dated December 31, 2008, attached as Exhibit A, at § 10.24(b).

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3) because Kratos and KeyBank are subject to personal jurisdiction in this District.

## THE PARTIES

7.      SPF is a Cayman Islands limited liability corporation with its principal place of business in Greenwich, Connecticut.

8.      Field Point is a Cayman Islands limited liability corporation with its principal place of business in Greenwich, Connecticut.

9.      Kratos is a Delaware Corporation with its principal place of business in San Diego, California. Kratos was originally incorporated in 1994 as Wireless Facilities, Inc. Kratos assumed its current name in 2007 and adopted its current business model of pursuing government defense contracts through the aggressive pursuit of strategic acquisitions.

10.    KeyBank is a national bank with its principal place of business in Cleveland, Ohio. KeyBank is included only as a necessary or indispensable party under Federal Rule of Civil Procedure 19. Silver Point does not assert any substantive claims against KeyBank.

## The Credit Agreement

11.    On information and belief, in the fall of 2007, Kratos approached an affiliate of KeyBank, Kratos's long-time lender, to seek financing for Kratos's intended acquisition of Haverstick Consulting.

12.    On October 24, 2007, Kratos obtained a commitment from KeyBank to provide Kratos with a loan up to $75 million. KeyBank thereafter took steps to syndicate a substantial portion of that loan to Silver Point.

13.    Silver Point assumed a portion of the loan pursuant to a First Lien Credit Agreement dated December 31, 2007, which provided a $25 million Revolving Credit Facility and a $50 million Term Loan Facility (the "Credit Agreement"). *See* Acceptance Letter, effective as of Jan. 2, 2008, attached as Exhibit B.

14.    As a condition of the loans, Kratos agreed to comply on a periodic basis with several different minimum financial tests, or covenants, including financial covenants requiring Kratos to maintain certain levels of liquidity, leverage and EBITDA. Kratos is subject to default under Section 8 of the Credit Agreement in the event that it fails to comply with any of the loan covenants.

## The March 27, 2008 Agreement

15.    Shortly after the Credit Agreement was executed, Kratos notified Silver Point and KeyBank that, "as a result of charges being taken in connection with certain payments to be made by [Kratos] in respect of (a) the settlement of [Kratos's] existing class action litigation

3

related to certain restatements of its financial statements, originally filed in August 2004 and consolidated as *In re Wireless Facilities, Inc. Securities Litigation*, Master File No. 04-CV-1589-JAH, (b) the settlement of [Kratos's] existing class action litigation related to [Kratos's] March 12, 2007 public announcement of an internal review of its stock option granting processes, originally filed in March and April 2007 and consolidated as *In re Wireless Facilities, Inc. Securities Litigation II*, Master File No. 07-CV-0482-BTM-NLS, and (c) the estimated settlement amount in connection with (i) [Kratos's] existing derivative lawsuits originally filed in August and September 2004 and consolidated as *In re Wireless Facilities, Inc. Derivative Litigation*, Lead Case No. GIC 834253, (ii) [Kratos's] existing derivative lawsuits originally filed in 2004 and consolidated as *In re Wireless Facilities, Inc. Derivative Litigation*, Lead Case No. 04-CV-1663-JAH and (iii) [Kratos's] existing and derivative lawsuit originally filed in April 2007, *Hameed v. Tayebi*, Case No. 07-CV-0680-BTM-RBB (such payments, collectively, the "Securities and Derivative Litigation Settlement"), [Kratos would] not comply with the Minimum EBITDA covenant set forth in Section 7.12(e) of the Credit Agreement for the fiscal quarter ending as of December 31, 2007." *See* Amendment and Waiver of Credit Agreement, dated March 27, 2008 ("March 27, 2008 Agreement"), attached as Exhibit C, at 1.

16.    To avoid default, Kratos therefore requested that KeyBank and Silver Point agree to amend the Credit Agreement "to (i) allow for the addback of ... charges [taken in connection with the Securities and Derivative Litigation Settlement] in the calculation of Consolidated EBITDA (as included in the Borrower's computation of the Maximum First Lien Leverage Ratio, Maximum Total Leverage Ratio, the Minimum Fixed Charge Coverage Ratio and Minimum Consolidated EBITDA covenants set forth in Sections 7.12(a), (b), (d) and (e)) and (ii) take account of accrued liabilities in connection with the Securities and Derivative Litigation

Settlement in calculating the Liquidity Ratio for purposes of the Minimum Liquidity Ratio covenant set forth in Section 7.12(c)[.]" *Id.*

17.     In other words, Kratos asked Silver Point and KeyBank to amend the Credit Agreement to enable Kratos to calculate its EBITDA in a way that would allow it to avoid default.

18.     Silver Point and KeyBank obliged, and on March 27, 2008, Kratos, Silver Point and Key Bank executed the March 27, 2008 Agreement.

19.     In connection with the March 27, 2008 Agreement, Kratos notified Silver Point and KeyBank that Kratos had received and expected to continue to receive "payments on account of judgment in a lawsuit filed by [Kratos] against is former employee, Vencent Donlan (such payments, collectively, the "Donlan Recovery")," and that it was negotiating "with one of its insurance carriers for recovery of certain amounts related to matters involving Vencent Donlan (such amounts, to the extent paid, the "Donlan Insurance Proceeds")." *See* March 27, 2008 Agreement at 2.

20.     Mr. Donlan, a former Kratos employee who left the Company in 2004, was subsequently investigated and pled guilty to federal wire fraud and tax evasion in connection with improper stock option practices he engaged in while employed with Kratos.

21.     Pursuant to the March 27, 2008 Agreement, Kratos further "acknowledge[d] that (i) the Donlan Recovery constitutes an Extraordinary Receipt and [would be] required to be used to prepay Loans pursuant to Section 2.4(b)(vi) of the [First Lien] Credit Agreement, [and] (ii) the Donlan Insurance Proceeds, to the extent received by [Kratos], [would] constitute Net Insurance/Condemnation Proceeds and [would] be required to prepay Loans pursuant to Section 2.4(b)(ii) of the [First Lien] Credit Agreement . . . ." *Id.*

5

22.    KeyBank and Silver Point agreed, subject to the terms of the March 27, 2008 Agreement, "to temporarily suspend the application of Section 2.4(b)(vi) to the Credit Agreement to the Donlan Recovery," and "to the extent [Kratos] receives any portion of the Donlan Insurance Proceeds, to waive the application of Section 2.4(b)(ii) to such Donlan Insurance Proceeds[.]" *Id.*

23.    However, with respect to the Donlan Insurance Proceeds specifically, Kratos, KeyBank and Silver Point agreed (i) that the Donlan Insurance Proceeds received by Kratos would be deposited in an account designated to make payments due by Kratos in connection with the Securities and Derivative Litigation Settlement; (ii) 100% of the Donlan Insurance Proceeds remaining after full payment of the Securities and Derivative Litigation Settlement would be used to prepay Loans under the First Lien Credit Agreement; and (iii) Kratos could include a maximum of $1 million of the Donlan Insurance Proceeds it received in its calculation of Consolidated EBITDA.  *See* March 27, 2008 Agreement at § 3(b)-(d).

24.    In its Compliance Certificates submitted to Silver Point and KeyBank for the fiscal quarter ended September 30, 2008 and for the fiscal year ended December 31, 2008, Kratos included in its calculation of Consolidated EBITDA approximately $3.91 million of insurance proceeds that Kratos acknowledged receiving in connection with investigations by the Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") into Kratos's historical stock option practices involving Mr. Donlan.

25.    The SEC and DOJ investigations qualify as "matters involving Vencent Donlan," as described in the March 27, 2008 Agreement.  Indeed, as Kratos itself acknowledged in its 10-K filed March 10, 2009, both the SEC and DOJ investigations were caused by Kratos's reporting

to the SEC of Vencent Donlan's theft of company assets, and Kratos cooperated closely with both investigations.

26.     Thus, the insurance proceeds received by Kratos in connection with the SEC and DOJ investigations, and included in Kratos's calculation of Consolidated EBITDA should have been, but were not, characterized by Kratos as Donlan Insurance Proceeds, as required by the March 27, 2008 Agreement.

27.     Although the SEC and DOJ has been investigating stock option practices put in place and then violated by Mr. Donlan, and, although those investigations were caused by Kratos's report of Mr. Donlan's activities to the SEC, Kratos has taken the position that the insurance proceeds Kratos received in connection with those investigations do not qualify as "Donlan Insurance Proceeds." Kratos also has improperly recharacterized work performed and proceeds received in connection with the cases against Mr. Donlan as work performed and proceeds received solely in connection with the SEC and DOJ investigations.

28.     By mischaracterizing insurance proceeds, Kratos has improperly avoided the $1 million limitation on the amount of Donlan Insurance Proceeds that could be included in the calculation of Consolidated EBITDA pursuant to section 3(d) of the March 2008 Agreement.

29.     Furthermore, by misapplying insurance proceeds, Kratos inflated its Consolidated EBITDA for the fiscal year ended December 31, 2008 and the first quarter of 2009.

## The MLR Issue

30.     Kratos also has attempted to avoid its obligations under the Credit Agreement by asserting that the MLRs set forth in Schedule 7.12(c) of the Credit Agreement contain an alleged error that renders the MLRs unenforceable as written. Silver Point disagrees that the parties somehow mistakenly agreed to the MLRs set out in Schedule 7.12(c) – specific ratios that were

reviewed by sophisticated counsel for all parties and that were expressly approved by Kratos's own business people. By this lawsuit, Silver Point seeks to resolve the parties' disagreement over whether the MLR covenant contains an error and is unenforceable.

31.    Section 7.12(c) of the Credit Agreement requires that Kratos not "[p]ermit the Liquidity Ratio at any time to be less than the correlative ratio indicated in the table set forth on Schedule 7.12(c)." *See* Credit Agreement at § 7.12(c).

32.    The accompanying Schedule 7.12(c) was prepared jointly by the parties.

33.    Schedule 7.12(c) sets out a negotiated table of ratios that correlate to time periods over the life of the loan; for example, the liquidity ratio for the quarter ending March 31, 2008 is 1.42:1:00. *See* Credit Agreement at Schedule 7.12(c).

34.    The parties each calculated their positions on these ratios on the basis of financial models that are neither incorporated into nor referenced in the Credit Agreement.

35.    For its part, Silver Point determined its position on what MLRs to request based on data and projections that Kratos itself provided.

36.    The Credit Agreement is a fully integrated and unambiguous contract, which was extensively negotiated by KeyBank, Kratos and Silver Point with the assistance of experienced and sophisticated counsel.

37.    Section 10.11 of the Credit Agreement provides that, "together with the other Loan Documents and any letter agreements referred to [t]herein, [the Credit Agreement] comprise[s] the complete and integrated agreement of the parties on the subject matter [t]hereof and supersedes any prior agreements, written or oral." *See* Credit Agreement at § 10.11.

38.    Notwithstanding the Credit Agreement's plain terms, in October 2008, ten months after the parties signed the Credit Agreement, Kratos claimed for the first time that the MLR

schedule it had been applying (and meeting) over the prior ten months contains an alleged "error," which required an amendment.

39.    On information and belief, Kratos was close to falling below the minimum liquidity levels required by Schedule 7.12(c) when Kratos first decided to claim an error in that schedule.

40.    However, soon thereafter, Kratos changed its mind and admitted that an error had not occurred. Indeed, as recently as December 15, 2008, Kratos's CFO Deanna Lund agreed that there was, in fact, no error at all: "Upon our further review of the Credit Agreement, we have determined that the actual covenant calculations set in the Credit Agreement are correct. . . . Accordingly, we do not need a correction to be made to the Liquidity Ratio covenant included in the Credit Agreement." *See* E-mail from D. Lund to M. Sheahan, dated Dec. 15, 2008, attached as Exhibit D.

41.    Four days later, however, Lund reversed course, and again claimed an error had occurred: "I sincerely apologize for the misunderstandings that have occurred over the past few days. I want to reiterate that the email that I sent the other day regarding the definition of the liquidity ratio was based on my recent read of the credit agreement. . . . It was not until [Laura Seigel, Kratos's Corporate Controller] and I had a call with Key two days ago did I come to the conclusion that we initially had come to . . . that there is an error in the manner that the covenants were established." *See* E-mail from D. Lund to M. Sheahan, dated December 19, 2008, attached as Exhibit E.

### The December 23, 2008 Agreement

42.     In December 2008, Kratos was facing imminent default under the Credit Agreement's Leverage Ratio covenant – a covenant that divides Kratos's total debt by its EBITDA.

43.     Kratos sought to avoid default in December 2008 by, among other things, purchasing a company called Digital Fusion Inc. ("DFI"), thereby adding to Kratos's income statement and increasing its EBITDA.  In other words, in addition to whatever other reasons Kratos may have had for acquiring DFI, Kratos sought to buy itself out of an impending default under the Leverage Ratio covenant by acquiring a company with more current earnings.

44.     To complete the DFI acquisition and to avoid default, Kratos needed Silver Point to waive certain express limitations in the Credit Agreement on Kratos's ability to buy other companies.  *See* Credit Facility at § 7.5(e)(viii)(A)(y).

45.     Prior to December 2008, the alleged "error" in the MLR covenant had been raised and discussed by the parties.  From October 2008 onwards (except in such instances as noted in paragraph 40 above), Kratos contended that the MLRs in Schedule 7.12(c) were in error and needed to be amended.  During this period, Kratos, KeyBank and Silver Point had been engaged in ultimately unsuccessful negotiations to amend the MLR covenant.  Silver Point initially proposed to amend the MLRs as part of a more global amendment of the Credit Agreement to address other issues, but Kratos was not interested.  Kratos later offered $170,000 for Silver Point to agree to an amendment to Schedule 7.12(c), and Silver Point countered with $850,000.

46.     When Kratos approached Silver Point and asked that Silver Point waive the acquisition limitations to allow the DFI acquisition, Silver Point decided to enter into an agreement and provide that waiver.

47.    In exchange, Silver Point required that Kratos agree and affirmatively represent in writing that all the terms of the existing Credit Agreement as written were "legally valid, binding obligations of [Kratos]" and were each "enforceable against [Kratos]" on a going forward basis. *See* Waiver Agreement, dated December 23, 2008 (the "December 23, 2008 Agreement"), attached as Exhibit F, at § 4.

48.    Kratos met Silver Point's demand, and the parties' agreement was memorialized in the December 23, 2008 Agreement. *See* Ex. F.

49.    In addition, Kratos expressly agreed in the December 23, 2008 Agreement that "neither Administrative Agent nor [Silver Point] shall be liable under a claim of, and hereby waives any claim . . . based on lender liability (including, but not limited to, liability for breach of the implied covenant of good faith and fair dealing . . . .) as a result of the waivers contained herein and any discussions or actions taken or not taken by . . . [Silver Point] on or before the date hereof or the discussions conducted in connection therewith, or any course of action taken by Administrative Agent or any Lender in response thereto or arising therefrom." *See id.* at § 12.

50.    Derspite the unambiguous terms of the December 23, 2008 Agreement, Kratos currently claims that the MLRs set forth in Schedule 7.12(c) of the Credit Agreement contain an error and should be reformed. Silver Point, for its part, disagrees, and maintains that the Credit Agreement is enforceable both as written and as subsequently affirmed by Kratos.

51.    Kratos also has claimed that Silver Point's position with respect to the enforceability of the MLR covenant constitutes a breach of the implied covenant of good faith and fair dealing, notwithstanding Kratos's reaffirmation of the MLR covenant as written and notwithstanding Kratos's express waiver of any such claim as set forth in paragraph 49 above.

Silver Point, for its part, disagrees and claims that it has never violated the implied covenant of good faith and fair dealing with respect to the parties' Credit Facilities.

52.    Kratos also has claimed that the parties to the DFI acquisition closed their transaction in reliance upon Silver Point's alleged "confirmation of the Calculation Error [in the MLR covenant] and [its] promise to correct it." Silver Point, for its part, disagrees and claims that Silver Point has never confirmed any error in the MLR covenant nor stated that it would amend that covenant without to be agreed upon consideration. As a result, this Court's finding on the enforceability of the MLR covenant has a material effect on Silver Point's liability for potential claims based on this transaction.

53.    Neither Kratos nor Silver Point is willing to abandon its position regarding the MLRs set forth in Schedule 7.12(c). Unless this dispute is resolved, Kratos has threatened that Kratos and other third parties may sue Silver Point.[1] This situation gives rise to an actual claim and controversy over which this Court may exercise jurisdiction.

---

[1]    In fact, Kratos already has sued Silver Point in the United States District Court for the Northern District of Ohio in Case No. 09-cv-1284 (AA) (the "Ohio action"), alleging that the Credit Agreement should be reformed because of the alleged error in the MLRs, and asserting a claim for breach of the implied covenant of good faith and fair dealing. Silver Point, however, is not subject to personal jurisdiction in Ohio, and have moved to dismiss Kratos's Complaint on that basis. Plaintiffs will proceed with this action only if the Ohio action is dismissed.

## CAUSES OF ACTION

### First Cause of Action

### Declaratory Judgment That Kratos Has Improperly Mischaracterized Insurance Proceeds Under The Terms Of The Credit Agreement (Against Kratos)

54.    Silver Point repeats and incorporates each allegation in the preceding paragraphs of this Complaint, as if fully set forth herein.

55.    Kratos agreed in writing in the March 27, 2008 Agreement that: (a) the Donlan Insurance Proceeds received by Kratos would be deposited in an account designated to make payments due by Kratos in connection with the Settlement and Derivative Litigation Settlement; (b) 100% of the Donlan Insurance Proceeds remaining after full payment of the Securities and Derivative Litigation Settlement would be used to prepay Loans under the First Lien Credit Agreement; and (c) Kratos could include a maximum of $1 million of the Donlan Insurance Proceeds it received in its calculation of Consolidated EBITDA. *See* March 27, 2008 Agreement at § 3(b)-(d).

56.    The March 27, 2008 Agreement is incorporated by reference and is a part of the First Lien Credit Agreement.

57.    The First Lien Credit Agreement is, in all respects, a valid and enforceable contract at law.

58.    Silver Point has and continues to be in complete compliance with its obligations under the First Lien Credit Agreement, a fact Kratos has never disputed.

59.    Kratos has deliberately and without justification included over $1 million of Donlan Insurance Proceeds in its calculation of Consolidated EBITDA.

13

60.     In addition, Kratos has indicated its intention to continue to include these funds in its calculation of Consolidated EBITDA to the extent it receives additional Donlan Insurance Proceeds in the future.

61.     Silver Point is entitled to judgment declaring that (i) the insurance proceeds received by Kratos in connection with the SEC and DOJ investigations, and included in Kratos's calculation of Consolidated EBITDA should have been, but were not, characterized by Kratos as Donlan Insurance Proceeds, as defined in the March 27, 2008 Agreement, and (ii) Kratos has improperly mischaracterized these insurance proceeds, thereby inflating its Consolidated EBITDA for the fiscal year ended December 31, 2008 and the first quarter of 2009.

## Second Cause of Action

**Declaratory Judgment That The MLRs Are Enforceable As Written And That The Parties' December 23, 2008 Agreement Bars Any Claim That The MLRs Are In Error (Against Kratos)**

62.     Silver Point repeats and incorporates each allegation in the preceding paragraphs of this Complaint, as if fully set forth herein.

63.     The Credit Agreement is a fully integrated and unambiguous contract, which was extensively negotiated by the parties with the assistance of experienced and sophisticated counsel.

64.     The Credit Agreement includes various covenants, including the MLR covenant.

65.     The plain and unambiguous language of the Credit Agreement provides that Kratos shall not allow "the Liquidity Ratio at any time to be less than the correlative ratio indicated in the table set forth in Schedule 7.12(c)." *See* Credit Agreement at § 7.12(c).

66.     The terms of Schedule 7.12(c), which were prepared jointly by the parties after significant negotiation, are also plain and unambiguous.

67.    In short, there is no error in Schedule 7.12(c).

68.    In addition, the December 23, 2008 Agreement states that all the terms of the Credit Agreement as written (including the MLRs) are "legally valid, binding obligations of [Kratos]" and are each "enforceable against [Kratos]" on a going forward basis. *See* December 23, 2008 Agreement at § 4.

69.    Kratos ratified the terms of the Credit Agreement, including the allegedly erroneous MLRs, after having first raised the alleged error in the MLRs with Silver Point and KeyBank.

70.    Kratos also expressly agreed in the December 23, 2008 Agreement to waive any claim against Silver Point based on lender liability, including liability for breach of the implied covenant of good faith and fair dealing.

71.    Silver Point is entitled to judgment that the MLRs are enforceable as written and that Kratos is barred from bringing any claim that the MLRs are in error or that Silver Point's position with respect to the MLRs is a breach of the implied covenant of good faith and fair dealing because (i) the terms of the Credit Agreement, including Schedule 7.12(c), are plain and unambiguous; (ii) Kratos performed under the terms and met the MLRs for approximately ten months before first raising the alleged error; (iii) after raising the error, Kratos ratified the terms of the Credit Agreement, including the allegedly erroneous MLRs, as written; and (iv) Kratos expressly waived any claim against Silver Point based on lender liability, including liability for breach of the implied covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

**WHEREFORE**, Silver Point hereby respectfully requests that this Court grant judgment for Silver Point as follows:

(1)    That the Court declare the Credit Agreement, including Schedule 7.12(c) thereof, is binding and enforceable as written against Kratos;

(2)    That the Court declare that Silver Point has not breached the implied covenant of good faith and fair dealing in insisting that Kratos comply with the MLR covenant as written;

(3)    That the Court declare that Kratos has mischaracterized $3.9 million in insurance proceeds as EBITDA for purposes of measuring compliance with the covenants contained in the Credit Facilities;

(4)    That Kratos be required to pay Silver Point's costs and disbursements in this action, including reasonable attorneys' fees; and

(5)    That Silver Point be awarded such additional and further relief as the Court may deem equitable and just.

Dated:  August 5, 2009                        LATHAM & WATKINS LLP


By: _____
        Joseph J. Frank
        Meghan H. Sullivan
        LATHAM & WATKINS LLP
        885 Third Avenue
        New York, New York 10022-4834
        (212) 906-1200

        Keena M. Hausmann
        One Newark Center, 16th Floor
        Newark, New Jersey 07101-3174
        (973) 639-1234
        *Counsel for Plaintiffs Field Point III,
        Ltd. and SPF CDO I, Ltd.*